**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVANNAH D. BYERS, *et al.*, | : | Civil No. 1:20-CV-02110 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| FINISHING SYSTEMS INC., *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

**<u>MEMORANDUM</u>**

This case arises from a catastrophic, fatal workplace explosion that occurred at Letterkenny Army Depot in Chambersburg, Pennsylvania ("Letterkenny"). The explosion and resulting fire claimed the lives of Letterkenny employees Eric Byers ("Byers") and Richard Barnes ("Barnes"), and severely injured another employee, Cody Ash ("Ash"). This lawsuit has been extensive. Plaintiffs brought over thirty claims against nearly two dozen defendants. However, after lengthy discovery and negotiation, the only matters remaining in contention are Plaintiffs' claims for negligence, negligent infliction of emotional distress, and wrongful death against Carlisle Fluid Technologies ("Carlisle"). Currently before the court are Carlisle's motions for summary judgment. The critical issue the court must decide is whether Carlisle assumed a duty—either by contract or gratuitously—to provide safety training to Plaintiffs. The court finds that Carlisle did not. Thus, the court will grant summary judgment in favor of Carlisle.

1

## FACTUAL BACKGROUND

The events giving rise to this lawsuit occurred in Building 350 at Letterkenny and, specifically, its enclosed paint mixing room ("Paint Kitchen"). Built in 2012, the Paint Kitchen "served as a central mixing and distribution center for the paint spray booths" located in Building 350. (Doc. 365-14, p. 22.)[1] The system inside the Paint Kitchen, in relevant part, allowed operators to transfer paint "coatings" from 55-gallon drums into a mixing carousel. (*See id.*) The system used pumps to enable this transfer. (*See id.*)

### A. Renovation of the Paint Kitchen

In 2017, Letterkenny contracted with Finishing Systems Inc. ("Finishing Systems") to upgrade the Paint Kitchen. (Doc. 365-8.) The two parties executed a contract, which contains two provision relevant to the present motions. First, the contract called for Finishing Systems to upgrade all five of the Paint Kitchen's pumps, three of which operated electrically and two of which operated pneumatically. (*Id.* at 9.) Second, the contract also called for Finishing Systems to provide instruction to Letterkenny personnel according to the following terms:

> INSTRUCTION: The contractor shall conduct no less than 2 hours of operator instruction for up to 6 personnel that are already familiar with the operation of [Letterkenny's] existing paint booths and mixing operations, and shall conduct no less than 4 hours of maintenance instruction for up to 6 personnel familiar with the maintenance of [Letterkenny's] existing paint booths.

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

(*Id.* at 12.)

Letterkenny generally included this type of provision in contracts involving newly installed systems so that its personnel received operator training, *i.e.*, "how to use any new equipment," and maintenance training. (Doc. 365-17, pp. 2–3.)

### 1. Finishing Systems subcontracts with Schweitzer & Crosson, who subsequently subcontracts with Carlisle.

Finishing Systems subcontracted the work of replacing the pumps to Schweitzer & Crosson. (*See* Doc. 365-9, p. 2.) As part of the agreement, Schweitzer & Crosson agreed to install the new pumps and offer operator training. (*See id*. at 2–3.)

Carlisle then submitted a system proposal to Schweitzer & Crosson, titled "System Proposal No. MRC17-033A" ("Carlisle Proposal"). (Doc. 365-10.) The Carlisle Proposal includes descriptions of all the services that Carlisle can offer. (*See id.* at 6–7.) But, the descriptions included the caution, "(If Purchased – See Component Outline)." (*Id.* at 6.) Moreover, a cover letter included in the Carlisle Proposal states that the "proposal is limited to the equipment listed in the Component Outline." (*Id.* at 2.)

The Component Outline lists several pieces of equipment, including the three electric pumps required for the Paint Kitchen renovation. (*Id.* at 3.) It also lists two services. (*Id.*) The first is titled "Lot Project Management." (*Id.*) The Carlisle Proposal describes its "project management" service as follows:

Project Management
Our Project Managers provide personalized service to each of our customers during the course of a project. The Project Manager will assist you from the beginning to the end of your project. Throughout the project, the Project Manager will be your main contact for all your questions and information that you may require.

When the project is complete, you will be provided with a comprehensive project package that includes your system drawings service literature, parts list and recommended spare parts list.

(*Id.* at 6.)

The second service is titled "Installation Supervision days." (*Id.* at 3.) The Carlisle Proposal provides the following description of that service:

Supervision of Installation
Carlisle Fluid Technologies will furnish the services of an installation supervisor for a period as specified in our Component Outline to supervise the installation of the equipment supplied by Carlisle Fluid Technologies.

The purchaser shall provide all labor and furnish all tools, scaffolding and other installation equipment necessary. This supervision service is based on our estimate of the number of days for completion of installation and is contingent on the purchaser's ability to obtain adequate capable labor.

(*Id.* at 6.)

The Carlisle Proposal also includes additional terms and conditions. (*Id.* at 9–16.) The terms and conditions, in relevant part, includes a "Production Service" provision, which states:

Production Service
Seller will furnish the services of a field service representative for the time specified in the Proposal. The field service representative will

assist the end user or contractor with the start-up.  The field service representative will assist and train your personnel in the correct use, care and maintenance of the equipment supplied by Seller.  This service is based on our estimate of the number of days for completion of normal start-up, check-out, and assistance required for the equipment of this type.

(*Id.* at 12.)

Schweitzer & Crosson accepted the Carlisle Proposal in full.  (*See* Doc. 371-19, p. 1.)  The Paint Kitchen's renovation was completed in 2018.  (Doc. 365-5, ¶ 5; Doc. 365-14, p. 26.)

## B. Training of Letterkenny Employees

Letterkenny employees were required to have training provided per Letterkenny's contract with Finishing Systems.  (Doc. 365-8, p. 12.)  Finishing Systems, however, did not perform this training.  (Doc. 365-20, pp. 84–85.) Schweitzer & Crosson did not perform this training either, despite offering training services in its proposal to Finishing Systems.  (Doc. 365-19, p. 43; Doc. 365-9, p. 3.)  Instead, Schweitzer & Crosson expected Carlisle to perform this training, according to James Lonsdorf ("Lonsdorf"), a salesman for Schweitzer & Crosson. (Doc. 365-19, p. 43.)

Ultimately, James Aikman ("Aikman"), a civilian contractor at Letterkenny, asked Mark Hagedorn ("Hagedorn") to provide training to Letterkenny employees. (*Id.* at 43–44.)  Hagedorn was one of Carlisle's employees present at Letterkenny

between May 1 and May 4, 2018.  (Doc. 365-5, ¶¶ 131, 133.)[2]  Hagedorn testified

at his deposition that Aikman asked him generally to "get [the personnel] familiar

with the system."  (Doc. 365-21, p. 117.)  Hagedorn further testified that he

thought his role was to "point out the different components" of the Paint Kitchen's

system "as just an introduction to the equipment and beginning familiarity with it."

(Doc. 365-5, ¶ 141; Doc. 365-21, p. 24, 136.)

Hagedorn then presented one training to Letterkenny personnel, including

the paint operators who would use the system.  (Doc. 365-1, p. 23.).  The training

lasted between approximately 30 and 60 minutes.[3]  There is no evidence that

Hagedorn discussed general or specific safety topics as part of the training.  Rather,

the training generally consisted of an "overview of the new equipment."  (Doc.

365-5, ¶ 75).  Specifically, the training covered "how to transfer paint . . . from a

---

[2] The parties dispute what Hagedorn's official role was at Letterkenny.  Carlisle insists that he was an installation supervisor.  (Doc. 365-5, ¶ 131; Doc. 365-21, pp. 4–5.)  Plaintiffs counter that Hagedorn was actually a "field service representative," as used in the "production service" section of the Carlisle Proposal.  (Doc. 371-1, ¶ 131; Doc. 365-21, pp. 62–63.)  This dispute is ultimately immaterial for the reasons explained in the Discussion section of this memorandum.

[3] The parties dispute how long the training actually lasted.  Defendant notes that Lonsdorf testified the training consisted of two sessions, one lasting two hours and another lasting one hour.  (Doc. 365-19, pp. 46–47.)  Plaintiffs insist the training was much shorter.  (Doc. 371-1, ¶ 88.)  They note that Ash testified the training lasted 40–45 minutes (Doc. 371-16, p. 2); that Brock Ashman, another painter, testified it lasted 30–60 minutes (Doc. 371-28, p. 2); and that Hagedorn testified it lasted 20–30 minutes.  (See Doc. 365-21, pp. 203–04.)  This is not a material fact.  Nevertheless, the court credits Plaintiffs' evidence, as the non-movant, in arriving at this duration figure.  *See Hittle v. Scripto-Tokai Corp.*, 166 F. Supp. 2d 142, 147 (M.D. Pa. 2001) (quoting *Carter v. Exxon Co. USA*, 177 F.3d 197, 202 (3d Cir. 1999) ("[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.").

6

drum into the 80[-]gallon holding tank," which included how to start the pump, "how to read the proper pressures on the inbound and outbound of the material," "how to set the pressures," and "how to adjust the numbers of the pressures on the control panel."  (Doc. 365-19, pp. 51–53.)[4]

### C. Explosion in the Paint Kitchen[5]

On July 19, 2018, Plaintiffs were working in Building 350 as civilian employees.  (Doc. 365-5, ¶ 2.)  That morning, Byers, Barnes, and Ash were working in the Paint Kitchen, while the other Plaintiffs—Cody King ("King"), Dylan Aldridge ("Aldridge"), Mike Rowles ("Rowles"), Samuel Smith ("Smith"), Tim Adams ("Adams"), and Walter Buryk III ("Buryk")—worked elsewhere in Building 350.  (*Id.* ¶ 3; Doc. 366, ¶¶ 15, 28, 40, 52, 67, 80.)  At that time, Byers, Barnes, and Ash were replacing an expended 55-gallon drum of polyurethane reducer (a.k.a. paint thinner) with a new drum.  (Doc. 365-5, ¶ 31.)  Polyurethane reducer was as a critical cleaning component of the Paint Kitchen system.  (Doc. 365-14, p. 130.)

---

[4] Hagedorn's training was done together with David Martinson ("Martinson"), another one of Carlisle's employees.  (*See, e.g.*, Doc. 365-22, pp. 43–48.).  Martinson testified that he was responsible for training on how to start and stop the Paint Kitchen system's "operator panel." (*Id.* at 47–48.)

[5] All parties accept as true the cause of the explosion detailed in Plaintiffs' experts' report.  (Doc. 365-14.)

The exchange process required operators to remove both a pump siphon tube and a desiccant canister from their respective holes on top of the expended drum. (*Id.* at 49.)  Prior to the incident, the operators removed the desiccant canister from the expended drum.  (*Id.* at 92.)  The opening in the drum allowed highly flammable polyurethane-reducer vapors to escape into the Paint Kitchen.  (*Id.*)  During this exchange, Byers, Barnes, and Ash were not wearing proper antistatic personal protection equipment.  (*Id.* at 114–15.)  This lack of antistatic controls ultimately led to a "static discharge" that ignited the vapors in the Paint Kitchen. (*Id.*)  The ignited vapors caused a "flash fire and subsequent deflagration" of the expended drum, which "caus[ed] an outward splash of ignited polyurethane reducer and a subsequent pool fire."  (*Id.* at 17.)

Byers, Barnes, and Ash were tragically engulfed in the flames.  (*Id.*)  Byers and Barnes suffered fatal injuries.  (*Id.*)  Ash survived but suffered "life-threatening burn injuries to 50% of his total body surface."  (*Id.*)  King, Aldridge, Rowles, Smith, Adams, and Buryk all witnessed the devastation caused by the explosion.  (Doc. 366, ¶¶ 17, 31, 43, 54, 69, 82.)

### PROCEDURAL HISTORY

Plaintiffs filed suit against numerous parties in Pennsylvania state court. Defendants removed the lawsuit from the Philadelphia Court of Common Pleas to the United States District Court for the Eastern District of Pennsylvania on June

30, 2020. (Doc. 1.) The Eastern District of Pennsylvania then transferred the lawsuit to this court, pursuant to 28 U.S.C. § 1404(a). (Doc. 182.) Plaintiffs have resolved all of their claims against the various defendants, except for the claims remaining against Carlisle. (Doc. 387, p. 1.)

On August 19, 2024, Carlisle filed two separate motions for summary judgment. (Docs. 364 & 365.) The court has considered the briefs in support and reply briefs filed by Carlisle, and the briefs in opposition filed by Plaintiffs. (Docs. 364-4, 365-1, 371, 372, 373, 374.) The court has also considered the parties' respective statements of material facts and accompanying exhibits. (Docs. 365-5, 366, 371-1, & 372-1.) This dispute is now ripe for review.

## JURISDICTION

Subject matter jurisdiction is vested in this court, because this lawsuit was properly removed from state court to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1441. The Eastern District then transferred venue to this court pursuant to 28 U.S.C. §1404(a).

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant' and 'material if it could affect the outcome of the case."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so ""may not rest upon the mere allegations or

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

In one of its motions, Carlisle's argues it is entitled to summary judgment on the negligence claim brought by Ash and the administrators of Byers's and Barnes's respective estates. (Doc. 365-1.)[6] Carlisle's other motion seeks summary judgment on the claims for negligent infliction of emotional distress brought by

---

[6] After Carlisle filed their motions, the parties filed a stipulation to dismiss Plaintiffs' strict liability claim against Carlisle. (Doc. 375.) That claim—Count XI—is no longer in dispute in this action.

King, Aldridge, Rowles, Smith, Adams, and Buryk.  (Doc. 364-4.)  In this diversity

action, the court looks to the substantive law of Pennsylvania to resolve this

dispute.  *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000).

### A. Negligence

To prevail on their negligence claims, Plaintiffs must prove: (1) Carlisle had

"a duty or obligation recognized by law"; (2) Carlisle breached that duty or

obligation; (3) "a causal connection between [Carlisle's] conduct and the resulting

injury"; and (4) "actual damages."  *Kelly v. St. Mary Hosp.*, 778 A.2d 1224, 1226

(Pa. Super. Ct. 2001).  The instant dispute centers around the element of duty.

"Absent a duty to act, there can be no negligence."  *Elbasher v. Simco Sales Serv.*

*of Pa.*, 657 A.2d 983, 985 (Pa. Super. Ct. 1995).  Accordingly, negligence claims

fail when "there is [no] duty upon the defendant in favor of the plaintiff."  *Straw v.*

*Fair*, 187 A.3d 966, 983 (Pa. Super. Ct. 2018) (quoting *Alumni Ass'n v. Sullivan*,

572 A.2d 1209, 1210–11 (Pa. 1990)).

Whether a duty exists is a question of law.  *Id.*  "A duty may arise from

common law, statute, or contract."  *Morello v. Kenco Toyota Lift*, 142 F. Supp. 3d

378, 382 (E.D. Pa. 2015).  A contract may give rise to a duty towards parties to the

contract as well as towards third parties.  Indeed, it is well settled in Pennsylvania

that the law will impose upon a contracting party "a duty to perform his contractual

undertaking in such manner that third persons—strangers to the contract—will not

be injured thereby." *Evans v. Otis Elevator Co.*, 168 A.2d 573, 575 (Pa. 1961);

*accord Bruno v. Erie Ins. Co.*, 106 A.3d 48, 69–70 (Pa. 2014); *Farabaugh v. Pa.*

*Tpk. Comm'n*, 911 A.2d 1264, 1283 (Pa. 2006).

      This long-standing duty to third parties was codified in Section 324A of the

Restatement (Second) of Torts. *Farabaugh*, 911 A.2d at 1283. Section 324A

states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts §324A (Am. Law Inst. 1965).

      Carlisle's motion solely challenges Plaintiffs' negligence claim on the

element of duty. Plaintiffs' theory of negligence is that Carlisle had a duty to

provide them safety training on the Paint Kitchen system and that its failure to do

so caused the explosion that injured Ash and killed Byers and Barnes. (*See* Doc.

371, pp. 5–8.) Plaintiffs contend that Carlisle had a contractual duty to provide

them safety training pursuant to the Carlisle Proposal. (Doc. 371, pp. 31–44.)

Alternatively, Plaintiffs argue that Carlisle gratuitously assumed a duty to provide them safety training when Hagedorn obliged Letterkenny's request to provide some training. (*Id.* at 44–48.) Carlisle contests both propositions. It insists that it neither had a contractual duty nor gratuitously assumed a duty to provide Plaintiffs safety training. (Doc. 365-1, p. 9.) The court addresses each issue in turn.

### 1. Contractual Duty

The duty to third parties imposed on a contracting party "is measured by the nature and scope of his contractual undertaking." *Evans*, 168 A.3d at 576. Therefore, the court must look to the Carlisle Proposal to determine whether Carlisle's contractual duties thereunder included a duty to provide safety training to Letterkenny personnel. In doing so, the court is guided by the ordinary guideposts of contract interpretation.

Courts interpreting contracts "attempt to ascertain the intent of the parties and give it affect." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009). In cases involving written contracts, "the intent of the parties is the writing itself." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 480 (Pa. 2006). When a written contract is clear and unambiguous, the parties' intent "is to be ascertained from the language used in the agreement, which will be given its commonly accepted and plain meaning." *LJL Transp., Inc.*, 962 A.2d at 647 (internal citation omitted). Only when ambiguity exists may a court look to parol

evidence "to explain or clarify or resolve the ambiguity." *Ins. Adjustment Bureau, Inc.*, 905 A.2d at 481.

Therefore, the threshold question in interpreting the Carlisle Proposal is whether the contract is ambiguous or unambiguous. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009). This is a question of law. *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) ("Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous."). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Ins. Adjustment Bureau, Inc.*, 905 A.2d at 481. A contract is unambiguous, on the other hand, "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21–22 (Pa. Super. Ct. 1995)).

Here, Plaintiffs contend that the "Production Service" provision in the "terms and conditions" portion of the Carlisle Proposal imposed upon Carlisle a duty to provide safety training to Plaintiffs. (*See* Doc. 371, p. 33.) Again, that provision states:

> Production Service
> Seller will furnish the services of a field service representative for the time specified in the Proposal. The field service representative will assist the end user or contractor with the start-up. The field service representative will assist and train your personnel in the correct use, care and maintenance of the equipment supplied by Seller. This service is based on our estimate of the number of days for completion of normal start-up, check-out, and assistance required for the equipment of this type.

(Doc. 371-9, p. 13.) Specifically, Plaintiffs argue that under this provision, Carlisle had a contractual duty to train "in the correct use, care and maintenance of the equipment," which necessarily includes safety training. (*See* Doc. 371, p. 31–39.) This is the only contractual provision upon which Plaintiffs' argument relies. Carlisle retorts that this provision is inoperative, because the Carlisle Proposal unambiguously excludes "production services" from Carlisle's offer to Schweitzer & Crosson. (*See* Doc. 374, p. 3–4.)

The court agrees with Carlisle on this point. The Carlisle Proposal unambiguously excludes production services from the services that Carlisle offered to provide Schweitzer & Crosson. The "production service" provision expressly states that Carlisle will only provide a "field service representative for the time specified in the Proposal." (Doc. 371-9, p. 13.) The Carlisle Proposal makes clear that Carlisle's offer of services was limited to what was included in the Component Outline. (*See, e.g.*, *id.* at 3 ("This proposal is limited to the equipment listed in the Component Outline . . . .").) The Component Outline lists two services, "Project

Management" and "Installation Supervision." (*Id.* at 4.) Carlisle never offered to provide production services or to furnish a field service representative in support thereof. Therefore, the "production services" provision upon which Plaintiffs rely is inoperative in this contract, and Carlisle had no duty to abide by its terms.

Plaintiffs do not identify any other contractual provision that would impose upon Carlisle a duty to provide safety training. While Plaintiffs offer a bevy of parol evidence on this issue, the court will not consider it in interpreting the unambiguous contract here. *See Ins. Adjustment Bureau, Inc.*, 905 A.2d at 481 (explaining that parol evidence is admissible only when a contract is ambiguous). Therefore, the court concludes—based on the unambiguous language of the Carlisle Proposal—that Carlisle had no contractual duty to provide safety training to Plaintiffs.

### 2. Assumption of Duty

Whether Carlisle had a contractual duty is only half of the inquiry. If Carlisle gratuitously undertook to provide safety training to Plaintiffs, then the law would impose upon Carlisle a duty to exercise reasonable care in its undertaking. *See* Restatement (Second) of Torts §324A (Am. Law Inst. 1965); *see also Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa. 1984) (explaining that "the essential provisions of [Section 324A] have been the law in Pennsylvania for many years"). "The scope of this rule . . . is measured by the scope of the defendant's

undertaking." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 (3d Cir. 2010).

Liability attaches only when "the defendant specifically has undertaken to perform

the task that [it] is charged with having performed negligently." *Patentas v. United

States*, 687 F.2d 707, 716 (3d Cir. 1982). Accordingly, the court must look to the

"particular undertaking[] that [Carlisle] agreed to perform" in determining if

Carlisle owed Plaintiffs a duty to provide safety training. *Matthews v. Prospect

Crozer, LLC*, 243 A.3d 226, 229 (Pa. Super. Ct. 2020).

Plaintiffs' argument is simple: Carlisle assumed a duty to provide them

safety training with respect to the Paint Kitchen system, because Carlisle

accommodated Letterkenny's request to provide some training on how to use the

Paint Kitchen system. (Doc. 371, p. 44.) Carlisle concedes that it provided some

training on the equipment it manufactured, but rejects that it undertook a

responsibility to provide an "all-encompassing training." (Doc. 374, p. 6.)

The essential question then is whether, under Section 324A of the

Restatement, Carlisle assumed a duty to perform safety training when it agreed to

provide some operational training on the Paint Kitchen's renovated system. The

parties have not pointed to any Pennsylvania Supreme Court decision specifically

addressing this question, nor has the court independently identified controlling

Pennsylvania precedent. Thus, this court must predict how the Pennsylvania

Supreme Court "would rule if faced with the issue." *Spence v. ESAB Grp., Inc.*,

18

623 F.3d 212, 216 (3d Cir. 2010). In doing so, the court "'must look to decisions of state intermediate appellate courts, of federal courts interpreting [Pennsylvania] law, and of other state supreme courts that have addressed the issue' as well as to 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the [Pennsylvania Supreme Court] would decide the issue at hand.'" *Id.* at 216–17 (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008)). Moreover, the court must be weary of "expanding state law in ways not foreshadowed by state precedent." *Id.* at 217 (quoting *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002)).

Here, the court finds several analogous cases involving Section 324A helpful in deciding the issue at bar. These cases underscore that courts are generally reluctant to broadly define what constitutes a defendant's undertaking and, consequently, impose broad duties under Section 324A.

In *Evans v. Liberty Mutual Insurance Co.*, plaintiff sued his employer's workmen's compensation insurance carrier after being injured "while attempting to dismantle a carboard box cutting machine." 398 F.2d 665, 665 (3d Cir. 1968). The plaintiff claimed that his injuries were caused by the insurer's negligent failure to "'adequately inspect' the cutting machine and to warn plaintiff of its alleged unsafe condition." *Id.* Prior to the accident, the insurer had done certain limited

inspections of the employer's plant and made safety recommendations for

insurance purposes.  *Id.* at 666.  As part of these inspections, the insurer did not

inspect or make any recommendations regarding the box cutter that injured

plaintiff.  *Id.*  Applying Pennsylvania law, the Third Circuit held that the insurer's

undertaking to conduct "spot inspections" did not impose upon the insurer a duty

"to make complete inspections."  *Id.* at 667 (internal quotation marks omitted).

In *Walls v. FTS International, Inc.*, the administrator of a decedent's estate

sued the parent company of the decedent's former employer for negligence.  No.

2:17-CV-00872, 2019 WL 96247, at *1 (W.D. Pa. Jan. 2, 2019).  The decedent

was a truck driver who had died in a truck accident that occurred after he fell

asleep behind the wheel.  *Id.*  The plaintiff alleged that the defendant assumed "a

duty to ensure that workers were adequately trained, including supervisors to

ensure the safety of their subordinates," because it had "provided documentation

and training to" its subsidiaries, including the decedent's employer.  *Id.* at 1, 4.

The defendant breached this duty, according to plaintiff, by failing to stop its

subsidiary's violations of safety regulations.  *Id.* at *2.  The district court dismissed

the plaintiff's claim on a motion to dismiss.  *Id.* at *5.  The court—assuming the

truth of the plaintiff's allegations—determined that providing some

"documentation and training" to the decedent's employer was insufficient as a

matter of law to show that the defendant assumed an ongoing duty to ensure

workers were adequately trained. *See id.* at \*4–5. The court persuasively reasoned, "Section 324A does not give rise to an implicit or derivative duty that stems from another related duty undertaken by defendant." *Id*. at 4; *accord Sheridan v. NGK Metals Corp.*, Civil Action No. 06-5510, 2008 WL 2156718, at \*8 (E.D. Pa. May 22, 2008) ("Section 324A does not impose any 'social,' 'implied' or 'derivative' duty. Rather, Section 324A imposes liability, reaching to third parties, upon a party's breach of a specifically undertaken duty."), *aff'd* 609 F.3d 239 (3d Cir. 2010).

The Northern District of Georgia decided a case factually similar to the one at bar. *See Strozier v. Herc Rentals Inc.*, 596 F. Supp. 3d 1336 (N.D. Ga. 2022) (applying Georgia law, which incorporates Section 324A). In *Strozier*, the plaintiff worked for a construction company. *Id.* at 1340. The defendant was an equipment rental company that leased a lift to the construction company so that it could replace fascia boards on a roof. *Id.* The construction company's crew, which included plaintiff and the company's owner, initially failed to get the lift operating; thus, they sought defendant's assistance. *Id.* Defendant sent one of its technicians to troubleshoot the list. *Id.* The technician determined that the owner failed to disengage a lock on the drive steer controller. *Id.* The technician also showed the owner "how to use the ground controls and the controls from the [lift's] basket." *Id.* Before the technician left, the owner assured the technician that he knew how

to use the lift. *Id.* Upon the technician's departure, one of plaintiff's co-workers attempted to raise the lift with plaintiff in it. *Id.* The lift then tipped over, injuring plaintiff. *Id.* The plaintiff argued that under Section 324A, defendant—through the technician's conduct—had assumed a duty to provide industry-compliant training to the plaintiff and the rest of the construction company's crew. *See id.* at 1344. The district court disagreed, holding that defendant did not assume a duty to provide comprehensive training to plaintiff by providing basic operating instructions. *See id.* at 1344–45.

Finally, the Pennsylvania Supreme Court has emphasized the narrowness with which courts recognize an assumed duty in the similar context of Section 323 of the Restatement (Second) of Torts.[7] *See Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984). In *Feld*, tenants of an apartment complex were kidnapped at gun point in their apartment's parking garage. *Id.* at 744. Plaintiffs sued the owners of the apartment complex, alleging that they owed Plaintiffs "a duty of protection" and their breach of that duty caused their victimization *Id.* at 744–45 The court

---

[7] Section 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (Am. Law. Inst. 1965). Section 323 concerns duties owed to the person for whom one undertakes to render services, whereas Section 324A concerns duties owed to third persons. Neither party argues that Section 323 is applicable in this case.

acknowledged that the defendants could have such a duty under Section 323 if they voluntarily "provide[d] a program of security." *Id.* at 747. The court cautioned, however, that the beneficiary of such a program "can only expect the benefits reasonable expected of the program as offered." *Id.* The court further explained, "[i]f, for instance, one guard is offered, [a beneficiary] cannot expect the same quality and type of protection that two guards would have provided." *Id.*

These cases illustrate the settled principle that Section 324A does not impose broad, comprehensive duties on those who perform limited undertakings. Rather, a limited undertaking results in a correspondingly limited duty. Applying that principle here, Carlisle's actual undertaking was quite limited, yet Plaintiffs seek to impose a broad duty. The evidence shows that Carlisle performed a single, time-limited training that focused on "how to transfer paint . . . from a drum into the 80-gallon holding tank," which included how to start the pump, "how to read the proper pressures on the inbound and outbound of the material," "how to set the pressures," and "how to adjust the numbers of the pressures on the control panel." (Doc. 365-19, pp. 51–53.) That is the limited scope of Carlisle's undertaking.

Plaintiffs point to nothing in the record to suggest that Carlisle agreed to offer safety training or actually discussed safety topics during its training. Instead, Hagedorn agreed to offer training that would get Letterkenny personnel familiar with the new equipment in the Paint Kitchen that was supplied by Carlisle. (*E.g.*,

Doc. 365-21, pp. 117, 136; Doc. 365-5, ¶ 141.)  He agreed to do this in the context of a renovation to the already-existing Paint Kitchen system.  This limited agreement is just that, limited.  Imposing a broad duty upon Carlisle to provide comprehensive safety training under these circumstances would run afoul of the principle articulated in, *inter alia*, *Evans*, *Walls*, *Strozier*, and *Feld*.  Plaintiffs point to no persuasive authority supporting its broad application of Section 324A.

The court, therefore, finds that Carlisle did not gratuitously assume a duty to provide safety training to Plaintiffs.  Accordingly, Plaintiffs' negligence claims fail.

### B.  Negligent Infliction of Emotional Distress

A viable negligence claim is the sine qua non of a claim for negligent infliction of emotional distress.  *See Kovalev v. Lidl US, LLC*, Civil Action No. 21-3300, 2024 WL 4642982, at *17 (E.D. Pa. Oct. 31, 2024) ("Without a viable claim for negligence, Plaintiff's negligent infliction of emotional distress claim also fails."); *Michtavi v. United States*, No. 4:CV-07-0628, 2008 WL 5703727, at *11 (M.D. Pa. Oct. 14, 2008) (quoting *Johnson v. Lowe's Cos.*, Civil Action No. 05-6018, 2007 WL 792332, at *4 (E.D. Pa. Mar. 14, 2007)) ("In Pennsylvania, to recover for negligent infliction of emotional distress a plaintiff must first establish the traditional elements of a negligence claim . . . ."); *Jordan v. Pa. State Univ.*, 276 A.3d 751, 774 (Pa. Super. Ct. 2022) (quoting *Brezenski v. World Truck*

*Transfer, Inc.*, 755 A.2d 36, 45 (Pa. Super. Ct. 2000)) ("Absent a finding of negligence, [a] negligent infliction of emotional distress claim cannot survive.").

Plaintiffs' complaint fails to identify the specific breach of duty that gives rise to their claims for negligent infliction of emotional distress. (*See* Doc. 3, ¶¶ 464–517.) Their briefing makes clear, however, that these claims are predicated on Carlisle's alleged failure to provide safety training. (*See, e.g.*, Doc. 372, p. 17.) Having found that Carlisle had no such duty, the court finds that Carlisle is entitled to summary judgment on Plaintiffs' claims for negligent infliction of emotional distress claims.

**CONCLUSION**

For the foregoing reasons, the court will grant Defendant's motions for summary judgment.  (Docs. 364 & 365.)  Accordingly, the court will grant judgment in favor of Defendant on Plaintiffs' claims for negligent infliction of emotional distress (Counts XXV through XXX) and negligence (Count XII). Defendant's motions did not seek judgement on Plaintiffs' wrongful death claims (Counts XXXI and XVII).[8]  Accordingly, the court will not grant judgment on those claims.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: March 11, 2025

---

[8] Although labeled Count XVII, this count appears immediately following Count XXXI.  (Doc. 3, pp. 133–35.)

26